**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **QUEST MEDIA GROUP, LLC,** | |
| **Plaintiff,** | **Case No. 2:12-cv-521** |
| **v.** | **Judge Peter C. Economus** |
| **LAKES OHIO DEVELOPMENT, LLC,** *et al.* | **MEMORANDUM OPINION AND ORDER** |
| **Defendants.** | |

This case arises from the parties' efforts to secure passage of a 2009 Ohio ballot initiative that amended Ohio's Constitution to permit casino gaming in the state.  Alleging breach of contract as well as other causes of action, Plaintiff Quest Media Group, LLC ("Quest") seeks damages and various equitable relief against Defendants Lakes Ohio Development, LLC ("Lakes Ohio"), Lakes Entertainment, Inc. ("LEI"), and Lyle Berman ("Berman").

Having reached a partial settlement, the parties have filed a Joint Motion to Dismiss Some But Not All Claims.  (Dkt. 47.)  In this motion, the parties seek dismissal of all counts in the complaint, with the exception of a single claim contained in Count I.  The Court hereby **GRANTS** the joint motion (Dkt. 47) and **DISMISSES** such claims.

The parties' partial settlement and the resulting dismissal of claims significantly limits the scope of the pending dispositive motions: Defendants' combined motions for summary judgment and judgment on the pleadings (Dkt. 29) and Quest's motion for partial summary judgment (Dkt. 35).  Quest had sought summary judgment on two issues relating to Count I, one of which is now moot.  Defendants had sought either summary judgment or judgment on the pleadings on every count; their motion is now moot with the exception of the motion for summary judgment on the remaining claim contained in Count I.

For the reasons that follow, Quest's motion is **DENIED** as to the Cap and **DENIED AS MOOT** as to the remaining issue (the "Pokagon Payment"), and Defendants' combined motion is **GRANTED** as to the unsettled claim contained in Count I and **DENIED AS MOOT** as to all other claims.

## I.   Background

**Parties.**   Quest, an Ohio limited liability company, provides consulting services relating to developing casinos in Ohio.  (Compl. ¶ 6.)  LEI is a Minnesota corporation that develops and operates casinos.  (Compl. ¶ 7; Answer at ¶ 7.)  Lakes Ohio is a Minnesota limited liability company which Quest alleges is wholly owned by LEI.  (Compl. ¶ 8; Answer at ¶ 8.)  Berman is the Chairman and Chief Executive Officer of LEI.  (Compl. ¶ 9; Answer ¶ 9.)  Quest alleges that Berman also holds those positions with Lakes Ohio.  (Compl. ¶ 9.)

**Failed 2008 Casino Initiative.**   To provide context for the contractual dispute in this case, Defendants present the affidavit of Timothy Cope, President, Chief Financial Officer, and Director of LEI.  Cope asserts the following regarding the parties' background:

> 4.      In April 2008, Lakes Ohio formed Blue Water Joint Venture, LLC ("Blue Water") with an entity called Myohionow.com, LLC ("Myohionow").  To the best of my knowledge, Myohionow was owned by Rick Lertzman and Brad Pressman.[1]  Mr. Pressman was its President.  The purpose of Blue Water was to promote a referendum in the November 2008 Ohio election to amend the Ohio Constitution so as to permit development of a casino in Clinton County, Ohio.  Generally, Myohionow's role in Blue Water was to organize the public campaign in support of the referendum.  Lakes Ohio's role was primarily to provide financing.
>
> 5.      Lakes Ohio ultimately contributed approximately $28 million to Blue Water in connection with the 2008 referendum effort.  Had the referendum succeeded, Blue Water would have

---

[1] It is undisputed that Bradford Pressman and Rick Lertzman are principals in Quest and were principals in MyOhioNow.com.  (Pressman Aff. ¶¶ 2–3 (Dkt. 36-1 at 2).)

owned the right to develop the casino it sought to authorize.  The referendum did not pass in the November 2008 election, however.

6.      The relationship between Myohionow and Lakes Ohio in connection with Blue Water was governed by an April 29, 2008 Joint Venture Agreement.  A true and correct copy of the Joint Venture Agreement, as filed with the Securities and Exchange Commission ("SEC"), is attached hereto as Exhibit A.

(Cope Aff. ¶¶ 4–6 (Dkt. 28).)  The Court will refer to the Joint Venture Agreement between Myohionow and Lakes Ohio, filed as Exhibit A to the Cope Affidavit, as the "Blue Water JV Agreement."

**2009 Casino Initiative.**  Following the failed 2008 casino initiative, the parties to this case worked with Penn Ventures, LLC ("Penn") and Rock Ohio Ventures LLC ("Rock"), two other casino development companies, to promote a casino initiative in the 2009 election.  This ultimately successful referendum authorized four casinos: one each in Columbus, Cincinnati, Cleveland, and Toledo.  (Compl. ¶¶ 16–18; Cope Aff. ¶ 7.)

**Agreements Between Defendants, Penn, and Rock.**  Quest alleges that LEI entered into agreements with each of Penn and Rock, in which the parties agreed that LEI would receive a percentage interest in each of the Ohio casinos operated by Penn or Rock.  (Compl. ¶¶ 19–21.)

According to the evidence submitted by Defendants, LEI and Penn entered into a "Joint funding arrangement and development option for gaming facilities in Ohio" (the "Penn Funding Agreement"), and Lakes Ohio and affiliates of Rock entered into the Operating Agreement of Rock Ohio Ventures LLC (the "Rock Operating Agreement").  Both agreements are attached as exhibits to the Cope affidavit.  (Cope Aff. ¶ 8, exs. B, C.)

Following voter approval of the referendum, the Penn Funding Agreement provided Penn with the rights to develop casinos in Columbus and Toledo (the "Penn Casinos"), and the Rock Operating Agreement provided Rock with the rights to develop casinos in Cleveland and

3

Cincinnati (the "Rock Casinos").  According to the Rock Operating Agreement, Lakes Ohio had a 10% equity interest in Rock.  (Cope Aff. ¶¶ 10–11, Ex. C.)  LEI was also provided the right to acquire equity interests in the Penn Casinos, but its exercise of that right required negotiation of more specific terms ("Definitive Documentation").  (Cope Aff. ¶¶ 10–11, Ex. B.)  According to Mr. Cope, LEI and Penn carried on negotiations attempting to agree on such specific terms until around June 2010.

**Agreements Between Quest and Defendants.**  Rather than receiving an equity interest or an up-front payment, Quest was to be compensated for its participation in the 2009 casino initiative pursuant to an agreement and security agreement between Quest and Lakes Ohio, dated March 9, 2010 ("Agreement" and "Security Agreement," respectively), as amended by a "First Amendment to Agreement" dated April 6, 2010 ("Amendment").  (Compl. ¶¶ 22, 33, 44, Exs. A, B, C; Cope Aff. ¶ 12, Exs. D, E, F.)

The Agreement provides that, in consideration of the services Quest performed relating to the 2009 casino initiative, Quest shall be paid a fee (the "Fee") in an amount equal to 18% "of the Gross Distributions after payment of any Additional Capital Required Return."  (Agreement page 1, §§ 1,  1.1(a).)  "'Gross Distributions' means the amount of cash received by [Lakes Ohio] from [the entities formed to develop and operate the Casinos] less any Prior Costs."  (*Id.* at § 1.1(b)(i), (iv).)  "Prior Costs" are defined to include the sum of the JV Loans (relating to the failed 2008 casino initiative), additional funds that Lakes Ohio spent to fund the 2009 casino initiative, and interest; all to be paid to Lakes Ohio in 20% increments annually ("Annual Allocations").  (*Id.* at § 1.1(b)(iii).)  The JV Loans are defined as funds advanced by Lakes Ohio "necessary to fund the 2008 Initiative, the principal of which totals approximately $27,775,000." (*Id.* at 1.)

Beginning when Lakes Ohio receives its first distribution from the entities formed to develop and operate the Casinos, "[e]ach installment of the Fee shall be paid to Quest within five (5) days after [Lakes Ohio] receives a distribution," until termination of the Agreement. (Agreement §§ 1.1(b)(iii)(a), 1.1(c).)  However, § 1.1(b)(iii) of the Agreement (hereinafter referred to as the "Cap") provides that, "[n]otwithstanding anything herein to the contrary, Quest shall receive no more than $500,000 annually until [Lakes Ohio] has been fully repaid for all Prior Costs."

As security for the payment of the Fee, Lakes Ohio granted to Quest a security interest "in an amount of the Distribution equal to its Fee pursuant to the terms and conditions of the Security Agreement." (Agreement § 1.3.)  Specifically:

> As security for the full and timely discharge of the Secured Obligations [defined as Lakes Ohio's "obligations to make all required payments under the Agreement"] . . ., [Lakes Ohio] hereby grants [Quest] a first priority security interest under the UCC . . . in and to the Collateral until all Secured Obligations are fulfilled.

(Security Agreement §§ 1, 2.)  "Collateral" is defined as "the right (whether categorized as a general intangible, payment intangible or otherwise) of [Quest] to receive payment under Section 1.1(a) and 1.1(c) of the Agreement." (Security Agreement § 1.)

The Amendment, dated April 6, 2010, gave Quest the options to increase the Fee to 18.5% by making a payment of $500,000 to Lakes Ohio by April 6, 2010, and to increase the Fee to 20% by making an additional $500,000 payment (for a total of $1 million) by July 1, 2010. (Amendment §§ 1–2.)  Quest alleges that it made a single payment of $500,000 to Lakes Ohio as agreed in April of 2010.  (Compl. ¶¶ 43.)

**Termination Agreement Between LEI and Penn; Payment to Quest.**  In June 2010, LEI and Penn entered into a Termination Agreement in which they terminated the Penn Funding

5

Agreement and LEI relinquished its interests in the Penn Casinos in exchange for a one-time payment of $25 million (the "Sale").  (Cope Aff. ¶¶ 13–14, Ex. G.)  Mr. Cope states that the $25 million payment under the Termination Agreement "is the only payment LEI or Lakes Ohio has ever received from Penn in connection with the Penn Casinos or the [Penn] Funding Agreement."  (Cope Aff. ¶ 15.)  On July 19, 2010, LEI paid Quest $500,000, which was a portion of the $25 million payment from Penn.  (Cope Aff. ¶ 16; Compl. ¶¶ 63, 135.)

All four Penn Casinos and Rock Casinos are now operational.  According to Mr. Cope, "Lakes Ohio continues to hold an interest in the Rock Casinos," but "neither Lakes Ohio nor LEI has received any payments in connection with the [casinos] other than the single $25 million payment from Penn described above."  (Cope Aff. ¶ 17.)

In June of 2012, Quest filed this lawsuit alleging breach of contract, fraudulent inducement, impairment of security interest, civil theft/conversion, tortious interference with contract, unjust enrichment, and promissory estoppel.  Quest seeks damages, equitable relief, appointment of a receiver, and imposition of a constructive trust.

Following the parties' partial settlement, the only claim at issue is Quest's:

> claim under Count I to money damages that alleges that Defendant Lakes Ohio breached its agreement with Quest (as amended) by failing to pay the full contractual amount, as per the terms of the Agreement and First Amendment (as defined in the Complaint), of Fees owed to Quest in connection with the $25 million that Lakes received from Penn in exchange for relinquishing Lakes' interests in the Penn casino projects.

(Dkt. 47 at 2.)  "The sole remaining disputed issue in the case relates to that breach of contract Claim," and is the "issue that Quest refers to as the 'Payment Cap Issue.'"  (*Id.*)  Of the parties' dispositive motions, then, the motions remaining are (1) Quest's motion for summary judgment on the "Payment Cap Issue" and (2) Defendants' motion for summary judgment as to the remaining claim under Count I.

## II.  **Summary Judgment Standard**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence and draw all reasonable inferences in favor of the non-moving party, *Matsushito Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), but "need not make assumptions that strain credulity," *Grecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 323 (6th Cir. 2012). Any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true. *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004).

The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Where the record completely contradicts the movant's version of the facts so that no reasonable jury could believe it, the district court should not adopt the movant's version of the facts. *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). Deposition testimony "alone is sufficient to create a jury question . . . ." *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 238 (6th Cir. 2010).

## III.  **Quest's Motion for Summary Judgment as to the Cap**

While Defendants seek summary judgment on Quest's contract claim, Quest originally sought summary judgment on two narrow aspects of this claim. (Dkt. 29 at 1; Dkt. 35 at 24–28.) Following the parties' partial settlement, only the first issue remains, which relates to the Cap contained in § 1.1(b)(iii) of the Agreement. The Cap provides that "[n]otwithstanding anything herein to the contrary, Quest shall receive no more than $500,000 annually until [Lakes Ohio] has been fully repaid for all Prior Costs." Quest seeks summary judgment requiring Lakes Ohio

to treat the Cap as a "payment cap" rather than as an "earnings cap." (Dkt. 35 at 26.) Quest asserts that "[n]owhere . . . does the agreement state that Quest cannot *earn* a Fee in a greater amount, which Fee would then be paid out over multiple years in $500,000 annual installments until it is exhausted." (*Id.* (emphasis in original))

The Court finds that the common sense reading of the Cap is that it limits the amount Quest can earn on a given distribution; that is, it is an "earnings cap," as Defendants argue. Quest focuses on the distinction between the words "receive" and "earn," but the Agreement makes no such distinction, and "receive" can be used as a synonym to "earn." *See* THE POCKET OXFORD AMERICAN THESAURUS OF CURRENT ENGLISH, 214 (Christine A. Lindberg ed., 2002).

Quest argues that Defendants are attempting to read an "annual cap" as a "per-distribution" cap. (Dkt. 46 at 3.) When there is no more than one distribution per year, however, such a reading makes sense, considering that Quest's fee is calculated as a percentage of a distribution received by Lakes Ohio, and is paid out of that distribution. (Agreement § 1.1(b)(iii)(providing for distributions to be applied to Quest's fee).)

Another provision supports interpreting the Cap as an earnings cap. In § 1.1(e) and (f), the Agreement provides Quest with two options to pay down the Prior Costs ahead of schedule. First, Quest had the "option of deferring one or more Fee payments in order to apply the Fee payment proceeds to the pre-payment of the Prior Costs and/or any Additional Capital Required Return (e.g., thereby reducing the principal balance of the Prior Costs earlier than as contemplated . . .)." Second, Quest had "the option to pay additional funds" to Lakes Ohio in order to "pay off the principal balance of the Prior Costs and any accrued Interest thereon." (Agreement § 1.1(e), (f).)

As soon as Prior Costs are reduced to zero, the Cap disappears. By exercising an option to pay down Prior Costs, Quest could eliminate the Cap ahead of schedule. The value of early elimination of the Cap depends on whether the Cap is interpreted as an earnings cap or a payment cap. As a payment cap, it affects only the timing of Quest's receipts, not the total amount that Quest eventually should receive (ignoring interest). As an earnings cap, it could substantially affect the total amount eventually received by Quest.

The first option to pay down Prior Costs has potential value to Quest under either reading of the Cap because deferring the payment of a fee would change subsequent fee calculations: For any given distribution received by Lakes Ohio, a lower calculated amount of Prior Costs would increase the remaining distribution on which Quest's 18.5% is calculated. It is possible that the interest cost of exercising the first option, under which a fee payment is merely deferred, would be worth the subsequent increase in Quest's fee calculation.

It is unclear what possible advantage Quest could gain by the second option, however, under Quest's interpretation of the Cap. Under the second option, Quest would simply pay additional funds to Lakes Ohio to reduce Prior Costs ahead of schedule, with no provision for those funds' repayment to Quest. This option could make financial sense for Quest only under the earnings reading of the Cap, under which early elimination of the Cap could substantially increase Quest's earnings.

The Court finds that, under Quest's argued interpretation of the Cap, there is no reason for the parties to have included the option contained in § 1.1(f), as it has no potential value under that interpretation. Such a result supports the common sense reading of the Cap as an earnings cap, rather than a payment cap.

Therefore, the Court finds that Quest has not demonstrated that it is entitled to judgment as a matter of law and **DENIES** its motion for partial summary judgment as to the interpretation of the Cap.

## IV. Defendants' Motion for Summary Judgment

Defendants seek summary judgment on Count 1, in which Quest asserts a breach of contract claim against Lakes Ohio. As to the sole claim remaining following the parties' partial settlement, Quest asserts that there is a genuine question of material fact as to whether Lakes Ohio breached the Agreement by paying only $500,000 to Quest in connection with the Sale.

As discussed above, the Cap limited Quest's first-year earnings to $500,000. Because the Cap limited Quest's first-year earnings to $500,000, the Court finds that there is no genuine dispute as to whether Quest was entitled to receive a greater share of the Sale proceeds and **GRANTS** Defendants' motion as to this claim.

## V. Conclusion

For the reasons discussed above, the Joint Motion to Dismiss Some But Not All Claims (Dkt. 47) is **GRANTED**, Quest's motion (Dkt. 35) is **DENIED** as to the Cap and **DENIED AS MOOT** as to the Pokagon Payment, and Defendants' combined motion (Dkt. 29) is **GRANTED** as to the unsettled claim contained in Count I and **DENIED AS MOOT** as to all other claims. This case is hereby **DISMISSED**, and the Court directs the Clerk to enter judgment.

 **IT IS SO ORDERED.**

**UNITED STATES DISTRICT JUDGE**